Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| B.F., individually and on behalf of C.F. a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>MERITAIN HEALTH INC., QUANTUM HEALTH INC., and the CUSHMAN & WAKEFIELD BENEFIT PLAN<br><br>Defendants. | COMPLAINT<br><br>Case No. 2:21-cv-00083 - DBP |

Plaintiffs B.F. and C.F., through their undersigned counsel, complain and allege against Defendants Meritain Health Inc. ("Meritain"), Quantum Health Inc. ("Quantum"), and the Cushman & Wakefield Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. B.F. and C.F. are natural persons residing in Douglas County, Colorado. B.F. is C.F.'s father.

1

2. Meritain is a subsidiary and affiliate of Aetna and was the third-party claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). B.F. was a participant in the Plan and C.F. was a beneficiary of the Plan at all relevant times. B.F. and C.F. continue to be participants and beneficiaries of the Plan.

4. C.F. received medical care and treatment at Forest Heights Lodge ("Forest Heights"). Forest Heights is a residential treatment facility located in Colorado which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. On July 15, 2019, Meritain and the Plan became responsible for the Plaintiffs' treatment, including the residential treatment at Forest Heights at issue in this case.

6. Meritain, acting in its own capacity or through its affiliate Quantum, denied claims for payment of C.F.'s medical expenses in connection with his treatment at Forest Heights.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because Meritain does business in Utah and across the United States. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Forest Heights

10. C.F. was admitted to Forest Heights on December 28, 2018, under a different insurer and insurance plan due to his suicidal ideation, aggressive and manic behaviors, and acts of self-harm, which other attempts at treatment had not been able to adequately address.

11. Meritain and the Plan became responsible for C.F.'s treatment as of July 15, 2019.

12. In a letter dated August 12, 2019, Quantum denied payment for B.F.'s treatment from July 15, 2019, forward. The denial, attributed to an unnamed medical director, stated in part:

> After Medical Director review; it was determined that the requested Residential stay from 07/15/2019 and forward is not medically necessary because treatment at this facility does not include nursing services 24/7 and a minimum of weekly visits with a psychiatrist, both of which are required by nationally recognized criteria. The treatment therefore could be provided in a less restrictive level of care, such as Intensive Outpatient Programming (IOP).
>
> Please be advised that the Cushman & Wakefield health benefit plan excludes coverage for services that are not medically necessary. You may refer to page 69, #28 of the plan document (copy attached) which outlines this topic.

13. On November 22, 2019, C.F.'s mother appealed the denial of payment at Forest Heights. She outlined her rights under ERISA including the reviewer's responsibility to take into account all of the information she provided, to provide her with a full, fair, and thorough review, to act in her best interest, and to clearly state the reasons for the denial. She

3

contended that ERISA required that reviewers' identities be disclosed and that they be appropriately qualified to conduct the review.

14. She argued that C.F.'s treatment was both medically necessary and a covered benefit under the terms of the Plan. She quoted the Plan's definition of medical necessity and contended that C.F. met this definition and that the treatment C.F. received was "the most appropriate and cost-effective option available."

15. She disputed Quantum's assertion that Forest Heights did not qualify as a residential treatment center, she contended that in the definitions section of her summary plan description, the only requirement listed for residential treatment was that it was recommended by a physician. She stated that C.F.'s "treatment at Forest Heights was strongly recommended by all of his treating professionals."

16. She wrote that she had requested a copy of the clinical guidelines used and noted that these guidelines stated that standards of care varied across the country and that the criteria "do not replace clinical judgment, and every treatment decision must allow for the consideration of the unique situation of the individual" and also that the guidelines were "governed by the terms of each individual customer's benefit plan and in accordance with applicable federal and state laws and regulations."

17. She contended that in spite of this, Quantum had "imposed arbitrary requirements inconsistent with both the terms and conditions of my plan and the Cigna criteria." She wrote that Forest Heights was a licensed and accredited residential treatment center which complied with the governing laws and regulations of the State of Colorado where it was located.

18. C.F.'s mother expressed concern that the Defendants were imposing more restrictive treatment limitations on behavioral health benefits than they placed on medical or surgical benefits. She asked for a formal parity analysis to be conducted as part of the review of the appeal in order to assess the Plan's compliance with MHPAEA. She asked to be provided with a copy of the results of this analysis as well as a copy of any and all documentation used. No such analysis was ever performed.

19. She contended that C.F. suffered from extremely complex mental illnesses which required specialized treatment. She contended that without this treatment intervention it was likely that C.F. would relapse and require even more intensive levels of treatment going forward. She noted that C.F. had a history of failed outpatient treatment followed by emergency acute level treatment and stated that this cycle had not been effective at treating C.F. in the past. She warned that this treatment pattern would continue if C.F. did not receive adequate treatment.

20. She included copies of C.F.'s medical records with the appeal. These included a letter of medical necessity from Colleen Bredell, MA, LPC, which stated that "[C.F.]'s safety was a grave and immediate concern" and that "I do not see any other course of action or placement that would be appropriate other than Forrest [sic] Heights at this time."

21. She requested that in the event the denial was upheld that she be provided with a copy of any administrative service agreements that existed, the Plan's clinical, medical, mental health, and substance use criteria. The Plan's skilled nursing, rehabilitation, and hospice criteria, and any reports or opinions from any physician or other professional regarding the claim. (collectively the "Plan Documents")

22. In a letter dated December 9, 2019, Quantum upheld the denial of payment for C.F.'s treatment. The letter, again attributed to an unnamed medical reviewer stated in part:

    *"After medical review, it was determined that the requested residential treatment stay from 7/15/19 and forward does not meet medical necessity criteria because the documentation provided did not indicate the member required psychiatric interventions that could not be carried out safely and effectively at a less intensive level of care. Additionally, the facility does not meet the definition of a residential treatment facility based on national criteria because the facility does not have on-site 24/7 psychiatric nursing care and monitoring."*

    Therefore, we are unable, to certify the requested mental health residential treatment stay from 07/15/2019 - forward as a covered benefit under the summary plan description language. (emphasis in original)

23. On January 28, 2020, C.F.'s mother submitted a level two appeal of the denial of C.F.'s treatment. She contended that Quantum had not complied with its responsibilities under ERISA, that it had not addressed her arguments or concerns and had instead issued an "incomplete and arbitrary denial blatantly ignoring everything I provided in my level one member appeal" including her argument that MHPAEA had been violated.

24. She contended that Quantum had evaluated the medical necessity of C.F.'s treatment using flawed proprietary criteria and had ignored her contention that these criteria were superseded by the terms of the Plan. She pointed out that such criteria had found to be flawed in several recent court rulings.

25. She argued that C.F. needed the level of care he was receiving in order to effectively treat his conditions and that Quantum's denial ignored the prevailing medical recommendations from the mental health community as well as the providers that had treated C.F. directly. She also noted that Quantum had not disclosed the names or qualifications of its reviewers in spite of her request.

6

26. She expressed concern that while her denial letter stated that she would be provided with the clinical rationale for the decision as well as a copy of any relevant documents upon request, she had previously requested these materials and they were not provided. She termed Quantum's behavior as both "capricious" and "condescending" and stated that it was incredibly difficult to appeal a denial of care or to perfect her claim when Quantum withheld the very information it encouraged her to request.

27. C.F.'s mother argued that Quantum had only superficially engaged with her appeal and had not provided her with the materials she requested, she asserted that Quantum "has committed these errors intentionally out of financial self-interest." She asked Quantum to fulfill its fiduciary duty and to provide her with the full, fair, and thorough review required by ERISA. She again requested to be provided with a copy of the Plan Documents.

28. In a letter dated February 13, 2020, again attributed to an unnamed medical reviewer, Quantum upheld the denial of payment. The letter stated in part:

   *"After medical review, it was determined that the requested residential treatment stay from 7/15/19 and forward does not meet medical necessity criteria because the documentation provided indicated the member was medically stable, able to provide for his basic self-care needs, and did not require psychiatric interventions that could not be carried out safely and effectively at a less intensive level of care."*

   Therefore, we are unable to certify the residential treatment stay from 7/15/19 and forward as a covered benefit under the summary plan description language. (emphasis in original)

29. On March 2, 2020, C.F.'s mother requested that the denial of C.F.'s treatment be evaluated by an external review agency. The Plaintiffs did not receive a response to this request.

30. On July 30, 2020, C.F.'s mother again requested that an external review be performed as she had yet to receive a response to the March 2, 2020, request. She asked the external review agency to acknowledge receipt of the appeal so that she could supplement it with additional information.

31. In a letter dated August 4, 2020, the external review agency upheld the denial of payment for C.F.'s treatment[1]. The reviewer wrote in part:

    **Is the requested service a Plan/Benefit exclusion as defined by the Summary Plan Description?**

    No, the requested service is not a Plan /Benefit exclusion as defined by the Summary Plan Description.

    **If not, is the requested health service medically necessary as defined by the Summary Plan Description?**

    No, the requested health service is not medically necessary as defined by the Summary Plan Description.

    Given the information provided, this request is not recommended for approval because the carrier's medical guidelines were not met as he [sic] had no objectively noted problems of any type that would have needed, any reason, [sic] the continuation of 24 hour care, supervision, observation, management or containment. (emphasis in original)

32. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

33. The denial of benefits for C.F.'s treatment was a breach of contract and caused B.F. to incur medical expenses that should have been paid by the Plan in an amount totaling over $80,000.

---

[1] The letter further shows that the reviewer received the clinical records, reviewed the claim, and drafted their opinion all on August 4, 2020. As this was all done in one day, it appears that the external reviewer disregarded the request to allow the appeal to be supplemented.

34. Meritain or its agents failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of B.F.'s requests.

//

//

//

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

35. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Meritain, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

36. Meritain and the Plan failed to provide coverage for C.F.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

37. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

38. The denial letters produced by Quantum or the external reviewer do little to elucidate whether a meaningful analysis of the Plaintiffs' appeals was conducted or whether they were provided with the "full and fair review" to which they are entitled. Meritain and its

agent Quantum failed to substantively respond to the issues presented in B.F.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

39. B.F.'s mother contended that she had been given an "incomplete and arbitrary denial" which did not address the arguments she raised and accused the Defendants of acting contrary to her interests and not providing her with the materials she requested.

40. Meritain and the agents of the Plan breached their fiduciary duties to C.F. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.F.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.F.'s claims.

41. The actions of Meritain and the Plan in failing to provide coverage for C.F.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

42. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

43. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

44. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant

treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

45. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

46. The medical necessity criteria used by Meritain and its agents for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

47. C.F.'s mother argued that Quantum had imposed arbitrary requirements inconsistent with the terms and conditions of the Plan including a failure to evaluate the medical necessity of C.F.'s care based on generally accepted standards of medical practice.

48. In addition, the medical necessity criteria applied by the Defendants failed to take into consideration C.F.'s safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

49. Quantum's initial denial letter reveals is lack of consideration for C.F.'s safety in a less

intensive treatment setting. The initial denial was predicated entirely on the grounds that the facility did not meet the Plan's requirements for residential treatment centers (an argument it later abandoned). Despite the fact that the initial denial was based entirely on Forest Heights's alleged failure to meet residential treatment requirements, Quantum did not recommend care in a different residential treatment center, as would be expected given such a denial, but instead recommended that C.F. receive care at the partial hospitalization level without conducting any analysis as to whether such care could be safely provided.

50. C.F.'s treatment team called his safety "a grave and immediate concern" and stated that he could not be treated safely in an outpatient environment. C.F.'s mother also expressed her concern with discharging C.F. prematurely. In spite of this, Quantum recommended discharging C.F. to a lower level of care, and as noted in the paragraph above, initially did so without conducting a medical necessity review of the treatment itself.

51. As another example of the Plan's improper application of its criteria to evaluate the treatment C.F. received, the Defendants relied on assertions such as C.F. being "*able to provide for his basic self-care needs*" as a justification to deny treatment. In fact, being able to provide for basic needs serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting. Meritain or its agents do not deny benefits for treatment in a sub-acute inpatient medical or surgical setting on the basis that the patient is not able to provide for their basic self-care needs.

52. When Meritain, Quantum, and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in

the terms of the Plan based on generally accepted standards of medical practice. Meritain, Quantum, and the Plan evaluated C.F.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

53. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, Quantum, and Meritain, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

54. Meritain and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Meritain, Quantum, and the Plan were not in compliance with MHPAEA.

55. The violations of MHPAEA by Meritain, Quantum, and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

56. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for C.F.'s medically necessary treatment at Forest Heights under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 9th day of February, 2021.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs' Residence:
Douglas County, Colorado